Take a moment, get yourselves ready. We'll hear argument now in case number 23-1396, Naranko versus Dishman. Mr. Stamoulis. Thank you. Good afternoon, your honors. Stamatio Stamoulis here on behalf of Dishman. I'd like to reserve three minutes for rebuttal. Granted. Thank you. Your honors, we are here arguing that the district court's decision below should be reversed because it granted summary judgment when material... Sorry. One moment. Could you turn on the timer? Please. Go ahead. Okay. Sorry. Thank you. Your honors, we are here because the district court's decision below should be reversed because it granted summary judgment when material issues of fact remained with regard to several critical issues. For example, there was a material issue of fact as to whether the Olivetol that was delivered by Dishman to Naranko was CGMP compliant at the time of delivery. There was a material issue of fact... Excuse me. Is that a relevant fact, an analysis of the Olivetol for purity as opposed to the fact whether it was simply produced in a facility that was certified or not certified? Yes, Judge Roth. It is critical because with regard to purity, there isn't any evidence on the record that the Olivetol had any impurities or did not meet specifications. Let me take you back. So we're in a Delaware contract case, which means we start with the language of the contract, right? Yes. And we don't look outside the language of the contract unless there's an ambiguity. Yes. In Delaware law, there's an ambiguity only if there is more than one objectively reasonable definition or interpretation of the contract, sorry. And so the language that's at issue that Judge Roth was just talking about is in compliance with CGM, correct? Yes. Is there an ambiguity with regard to the language in compliance with CGMP? There is possibly, and that is a fact issue. So wait a minute. But before you can get to, under Delaware law, before you go anywhere else, you look at that language and you determine is there an ambiguity in the plain language. For there to be an ambiguity in the plain language, there have to be two objectively reasonable meanings. So what are the two objectively reasonable meanings, or at least two objectively reasonable meanings? So one potential, Judge Montgomery, one potential reading is it means that the actual product was manufactured in compliance with CGMP, which is good manufacturing practices, right? You look at how the product was actually manufactured. So that would involve discovery on the people that were running the plant at the time, whether cleaning validation was performed for that specific product, the olivetol, when it was made, testing of the olivetol to confirm that it was free of impurities, specifications of the olivetol. That would go to that actual product. A different way to look at it would be was the plant certified as a CGMP plant when it made the product? That doesn't go to the specific manufacturer of the specific olivetol in March of 2020 when it was manufactured. It goes to, as a whole, did the plant have a proper certification? And one of the disputes in this case, because there was an inspection of the plant when the plant was making a different product. They were making a product called DHT, which is a vitamin D supplement. And during that inspection, the Swiss regulators found problems with the plant. They later... Yes, in fact, they did revoke the plant certification. And in order to protect the public, they issued an interim CNP, which is suitability for sale suspension, for those products that they observed. And they had the opportunity to issue an interim CNP suspension for other products that had been made at that plant, and they chose not to. And there's a factual distinction because the DHT product that was being made was an end product. The olivetol is an intermediate product. It's further refined before you get to a final product. All right. So, you know, you do have a problem. Section 4.1 talks not just about how the product is made, but how it's stored, the facility it's stored in, et cetera. Let's assume we disagree with you and we think that there's a breach. We still have a damages issue here. So let's assume it wasn't compliant, but when should Noramco have rejected it? And then I want to follow up with, and how do your clients' own statements about the product bear on when it should reasonably have known about this, and thus had the clock start ticking? Yes, Judge Petus. So on April 17th, Noramco was advised of the failed inspection. They knew that the plant had failed inspection and that the certification was going to be revoked. On April 20th, the Swiss regulators posted that failure to the Eudora website. But you were just saying this was with a different product. Yes, well, I'm sorry, Your Honor. Dishman does tell Noramco the Olivetol isn't affected by the inspection. There's not going to be an impact in the U.S. So was it reasonable for it to wait and do this back-and-forth correspondence for several months? Should the clock have started ticking in April? So on April 20th, the action by the Swiss regulator was not with regard to the DHT production. It was with regard to the plant. So on April 20th, the entire plant lost its certification. And if you look at the audit report of Noramco, which was issued, I believe, on July 16th, and let me give you a specific site to that in the reference. We have a volume three of the appendix, which was formally sealed, which we've now unsealed. But if you look at volume three, and it's going to be on pages 250 to 251, that report, which is the basis for Noramco's August 19th rejection, concluded that based on the Swiss medic finding of April 20th and the April 17th rejection, the plant was not affected by the inspection. And then on April 17th and April 28th, emails of dishmen saying, we are going forward, we are proceeding with this material not being CGMP. That quality report by the quality manager stated, we cannot go forward with a non-CGMP material. We can't use this. And so the moment that they knew that the plant was not CGMP, and if we assume for your purposes that we're going to take the date of inspection as the date the plant lost its CGMP certification, as opposed to the date that the final decision was made and made public, then that date, April 20th, that is the date that Noramco knew everything that it was going to know about the plant. It was going to know about the Olivetol not being CGMP. Because CGMP products, as Noramco says in its own brief, can only spring from a CGMP compliant plant. You can take steps after the fact with a risk assessment analysis, with, Judge Roth? Okay, sorry, Your Honor. You can take steps after the fact with a risk assessment analysis, with purity testing, to say that the product is safe for use and is suitable for use. But you can never retroactively make it CGMP. It's either CGMP when it's created or it's not. It's a binary situation. And so if, and I'd like, I can discuss the difference between the ALRA case and the 281 Bottles case, because I think that's important for your honors to consider in terms of deciding when does a product not, cease to be CGMP. But if let's say we go with the district court's determination under the 281 Bottles case that it's the date of inspection, as soon as Noramco learned of that inspection, that product was not CGMP, it could never be CGMP. And any other thing that they were waiting for after the fact was for a suitability of use as a non-CGMP product. Will you address for us when a product, the two cases that you just mentioned? Yes, Your Honor. So in 281 Bottles, that's a case where the FDA went into the plant, they inspected the plant, they found that there were violations in the plant, and they seized the product that was being made at the time of the inspection as being all CGMP non-compliant and illegal to distribute under U.S. law, because that was going to be a final end product. So that's a government seizure case. And as a result, this product is not CGMP compliant, and as an end product, under the FDA guidelines, it's illegal to distribute a non-CGMP pharmaceutical in the United States. So that's 281 Bottles. And they decided, besides cyanamide, hey, hold distribution of the product that you have, because we might issue a recall for that product. They ultimately decided to not issue a recall for that product, and they let the product be distributed. Cyanamide returned the product, saying that we don't want it, it's not CGMP, you had a failed inspection. All were sued, the district court denied summary judgment in that case, saying that it was a fact issue. Because the FDA's inspection involved a different product, not the product that cyanamide was being sold, that you had to make a case-by-case factual determination as to whether the product sold to cyanamide was in fact CGMP compliant. You couldn't just blanket use the plant inspection on, for a different product, on the cyanamide product. And that was a breach of contract case. There's a follow-up case that isn't cited in the record, but the district court denied early summary judgment in that case. They allowed three years of fact discovery to develop, and then in 99, there was a second round of summary judgment, and again, the court denied summary judgment, and said this remains a fact issue, we're going to trial. Judge Roth, do you have anything further? We'll get you back up here. Okay, thank you, Your Honors. Ms. Muhammad. May it please the Court, Jennifer Muhammad, appearing for Naranco, LLC. To quote the FDA, if a company is not complying with CGMP regulations, any drug it makes is considered adulterated under the law. This kind of adulteration means that the drug was not manufactured under conditions that comply with CGMP. It does not mean that there is necessarily anything wrong with the drug. The reason for this rule. Dishman says you're making this certificate expiration argument, this is brand new on appeal, so why didn't you put it this way below? Well, we did cite to this record below its summary judgment, and we did argue and prove at summary judgment that a GMP certificate is only as good as it is on the day that it was issued. And so we did not make the decision of EDQM. But here we point to page four, which points out that a GMP certificate cannot be relied on for greater than three years beyond its issue date. And in this case, the prior CGMP certificate was issued in 2016. This inspection occurred in February 26 to 8 of 2020. And we did not make the decision of EDQM. Now, does that mean compliant with a certification, or does that mean compliant with the actual purity of what was produced? How can we tell that from the agreement? And isn't that the real issue in a contract case? What does the agreement require? Yes, Judge Roth, we did actually make those arguments, and I would agree with you. There's nothing in this supply agreement that specifically required the facility to maintain a certificate. And that is in part due because the FDA does not issue certificates or require certificates. GMP under this contract was written to include US, EU, and Swiss GMP standards. And so the reason for the rule about GMP is to keep everyone, you, I, everyone in this courtroom safe, so that the medicines we take, we can be sure that they won't make us sick. And the record is overwhelmingly clear that there was no question of material fact that the Livitol was manufactured under conditions that did not comply with CGMP and that the Livitol was deemed to be adulterated. This circuit court should affirm the district court's decision for three reasons. One, as we've been talking about, Dishman violated the party's supply agreement by producing non-conforming material. Second, NARAMCO acted at all times consistent with its obligations under the supply agreement. NARAMCO properly noticed the latent defect, in this case, which is the GMP compliance status of the facility. NARAMCO also properly rejected the Livitol after the parties had engaged in the reasonable efforts investigation that was required under Section 4.3.3 of the contract. So tell me what I'm missing. Based on what I can see in front of me, the last back-and-forth correspondence I see is July 6. And the rejection comes August 19. Even if I take the latent defect provision, I think, which is 4.3, I think, and say 15 days beyond when the latent defect was known, how is there not a material dispute effect? I may be missing something in the record, but what am I missing beyond July 6 or whatever the date was? It's not July 6, Your Honor. It's that NARAMCO gave notice of the latent defect on April 18. Section 4.3.1 gave NARAMCO 30 days to inspect and then reject. Or in the event of a latent defect, NARAMCO had to notify Dishman of that latency within 15 days of it becoming aware or when it should have known there was a latent defect. As my colleague has pointed out, Dishman notified NARAMCO that the CEPs had been revoked for other products on April 17. The very next day, on April 18, NARAMCO emailed Dishman asking for proof that the product was CGMP compliant, including a list of questions. And NARAMCO also said, we have pulled this product from our ongoing production campaign in Switzerland. It had already been sent from the U.S. to Switzerland for use in the production of medicines. So the whole concept of whether the olivetol was recalled or not is really not relevant because NARAMCO instituted the recall, in part because of USP Park. USP Park. I want to just understand, so you said noticed. As I read the, maybe I'm missing something, but this says you shall have 30 days to inspect and reject. So are you saying that there was a rejection in April? No, NARAMCO did not reject in April, but NARAMCO gave notice of the GMP defect. But it says a rejection shall be by written notice. Are you talking about something different than a, I'm trying to figure out how, I read this to say there must be a written notice of rejection. If there is something, help me understand what this requires that is different than a rejection. I would agree. If NARAMCO outright rejected the material, say based on product purity, say it was too impure, say the recipe didn't match, the specifications didn't match, NARAMCO could have outright rejected the material done. But in this case, it was the GMP at the facility. The product was GMP based on the status of the facility. So here, that's the latency. NARAMCO said we need to know if this is GMP compliant or not. And you have to understand also, Dishman withheld the EDQM decisions from NARAMCO. First on April 17th, Dishman informed our CEPs for other products unrelated to your product were revoked. Didn't say that the facility lost its GMP status and did not provide the EDQM list of deficiencies, the final decision, all those things that came later, which are so catastrophic, right? Lizards, birds, rodents roaming around the facility, dust, dirt, cobwebs, total lack of cleaning validation. So we have this, but we don't have an unequivocal rejection. And we have a bunch of possible excuses here. Well, you know, this is a technical violation, et cetera, maybe it's okay, maybe it's not. And then there's this posting to the Swiss website and things. But so at what point is it clear that there's an unequivocal rejection such that we have a 15-day latent defect clock ticking? Well, again, we would say NARAMCO fulfilled that 15-day clock on day one, on April 18th. And then that shifted the parties of section 4.3.3, because Dishman disagreed. Okay, if we don't, if maybe we could read it that way, but there's some unclarity in Dishman's notice here. So, sorry, so then what? So I wish I could say that NARAMCO engineers were also lawyers and knew to use the word latent defect, right? But if you look at the definition of latent defect, it literally says a hidden or latent defect not detected by the analytical tests, that's what we have here, and which was not detected by NARAMCO during the inspection period. So again, NARAMCO could have done testing, you know, on and on and on, and it never would have proven the status of the GMP status of the facility. So it is by definition a latent defect, the GMP status of the facility. So then we looked at section 4.3.3, because Dishman said, well, we can prove to you that it's going to, we're going to issue a CAPA, we're going to issue a risk assessment plan, we're going to do all these other things. And so NARAMCO is acting consistent with its contractual obligations to use reasonable efforts. Okay. So we've got this issue about how to construe these papers. I'm not sure the district court's right on this, but the district court first relied on a forfeiture argument. And I've got some questions about that, too, because Dishman, it raised the time of rejection in its answer. NARAMCO's only mention of damages in its first summary judgment motion was the very last line of its opening brief. There's no arguments based on that. The arguments are entirely about, you know, the olivatol and the failing of the inspection. So should we treat, how did Dishman forfeit its timely rejection argument? I mean, are you not making that argument and saying just we should rule for you on the merits here? How, because if there's a forfeiture, we have to ask, did it have fair notice? It was supposed to raise this now when the court really seemed fixated on the inspection of the facility issue. Yes, Your Honor. Well, I would point out that NARAMCO did provide the court with proof of its damages in terms of the purchase order, the purchase price paid. Okay, but the argument, the first summary judgment motion is focused like a laser on the effect of the failure of inspection. So we had oral argument before Judge Bryson to determine whether NARAMCO had the court's permission, right, to file its motion for summary judgment. We look at that hearing transcript. Okay, I've got the hearing transcript. Walk me through how we should read it. And Mr. Stamoulis can then offer his interpretation. So where are you in the transcript? So I'm at the transcript, page 20, 25. It's sealed exhibit page 934 from the third volume. Page 20 here. So tell me what you see on these pages that makes it clear that speak now or forever hold your peace. Okay, so it's actually, I'm going to quote, starting on top of page 21. This is Mr. Stamoulis speaking. And I guess the only other thing we have to say on this issue is that I am, and I understand if Your Honor is limiting the question on summary judgment to one specific question, I think that could simplify matters. And then skip forward to line 14. If Your Honor is going to limit the question at issue in the summary judgment report to the legal issue of what? Basically the look back period of the Swiss medic report that was issued on April 20th and whether it would include product manufactured in March 2020. He goes on a little bit. But then if you skip to the top of page 22, Judge Bryson responds. What I have in mind is a motion for summary judgment. Not just a motion for the resolution of a single abstract or question, but a motion for summary judgment in the case. The pages go on. Mr. Stamoulis pointed out that he would file a Rule 56D affidavit saying that Dishman couldn't move forward without additional discovery. No such affidavit was ever filed. We proceeded to summary judgment. The court, Judge Bryson, gave Mr. Stamoulis at page 35. And Mr. Stamoulis, nothing further to which he responded. Nothing from defendant. Thank you very much, Your Honor. Okay. So then we go from there to the brief that's filed in response. And I'm looking at your first brief for summary judgment. I see the very last line says inclusive of Naranjo's demand for damages. But there's nothing else in the brief that raises an issue to which they're supposed to respond. What in this brief are they supposed to respond to saying, no, in fact, there's this defense of Title IX on damages? Well, the damages here were very clear. It was the purchase price. $600,750. We showed that we issued the purchase order for that amount. We showed that we paid for that amount. There was no dispute. But you agree that the entire brief is about the inspection certification issue? I would say, yes, that was the bulk of the argument. But clearly, there was no question about how much Naranjo had paid for the goods. Okay. And that, in fact, was the damages that were awarded. And I would point out to the memorandum opinion in order of the lower court, citing to Anari Bresman. Once a moving party with a burden of proof makes such an affirmative showing. What's the app citation or appendix? Appendix 001. Yeah, this was the district court's decision in citing to Anari Bresman, basically saying that once Naranjo had made its affirmative showing that there was no material question of fact, that the burden shifts to the non-moving party to come forward with probative evidence that would demonstrate the existence of a triable issue of fact. And as Your Honor sees from Dishman's reply brief, they failed to raise the issue of Naranjo's rejection, Naranjo's payment. None of that was included in their reply briefs. I got it. But at pages 8 to 9, the opinion is all about the core issue whether Olivotol was compliant, whether it was adulterated. And on page 13, that's how the court says its holding is. There's no dispute that it was delivering of Olivotol that was not compliant with CGMP. All right. And then in the conclusion, the court says the party should confer about the remedy. Okay. If they're unable to submit a remedy, then we'll go on and brief the remedy issue. So it's not in the first opinion does not treat this as foreclosing defenses to remedies. It's just the failure to timely reject in the second opinion. It's not till we get to the second opinion, the appendix 19 to 21, that the court brings this up. Well, again, your honor, there was no question of fact about how much Naranjo paid for the material. Right. About the timeliness of the rejection and that that is a defense. Which they again, they failed to raise that at all. We didn't. Why would we bring up in our brief that we didn't timely reject? We did reject. We did. Like I said, our latent defect notice was on April 18th. The very next day, the court quoted us as saying that. So we satisfied our 15 day time period within day one of being notified that the CEPs had been revoked for other other products. All right. Thank you. If I may, your honors. The basis for why Dishman disagrees with the forfeiture issue was fully briefed by Dishman in its rule 59 motion. And we include our brief at pages 907 to 912 of volume three. Essentially, it's exactly as your honor pointed out. There was an oral order, oral discussion on the transcript. It wasn't clear. No follow up order issued from the court outlining what it expected. It was Dishman's impression that this was an early summary judgment. It was also during a hearing when the judge decided that he was going to cut off discovery and quash our motions for interrogatories and for depositions, which would have helped inform with regard to the contract interpretation issue. So Judge Bryson quashed the discovery, directed us to go forward an early summary judgment on a discrete issue. We took away from that transcript what that discrete issue was. We went to the first round of summary judgment. We then went to the damages stage. The rejection issue was fully briefed in the damages stage, as well as the 4.3 limitation of remedies issue. Naramco didn't claim forfeiture in their opposition brief at the damages stage. They never raised it. The first time the forfeiture issue was raised was sua sponte by Judge Bryson in his opinion, but only with regard to the rejection issue, but not with regard to the limitation of remedies issue. So clearly other damages related defenses were found to be proper by Judge Bryson, properly briefed in round two. It just wasn't that one. And we believe it would be manifestly unjust for the court to sustain that. A couple other points that I would like to raise. There was mention that certain information was withheld by Dishman from Naranco. That covers only the April 17th to April 20th time period. On April 20th, everything regarding the Swiss Medic report was public. It was published on the Eudora website. It was for every global pharmaceutical manufacturer to see. So on April 20th, nothing that happened with Swiss Medic was not known to Naranco. It became a matter of public record. I want to circle back for a brief moment on that motion to quash discovery. What Dishman was seeking was discovery with regard to methadienyl. Methadienyl was a product that was manufactured in the same plant under the same circumstances. It was delivered a couple weeks earlier. It was actually manufactured after the DHT was manufactured that Swiss Medic issued the suspension on. And Naranco accepted it and Naranco used it. The final thing I would say, Your Honors, is look at the June 17th date of payment. Payment was due June 3rd. Under the agreement for nonconforming goods, Naranco was entitled to withhold payment while it was investigated. It didn't have to pay on June 17th. It could have rejected on June 17th. And if this gets reversed and we go back to trial, we intend to introduce evidence that they knew full well what they were getting because June, it was 2020, it was COVID, the entire supply chain was shut down. They did not want to lose this product. They did not want to send it back and miss an opportunity and let it go to a competitor. So they paid for it and that payment is acceptance and it is waiver of everything that they knew up until that point. Thank you, Your Honors. You've indulged me quite enough. Thank you, Mr. Stamoulis. We'll take the case under advisement. Let's go off the record and greet counsel at Session.